UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ALEXANDER HOWELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:22-CV-218-ACL |
| JIMMY KENNON, et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM AND ORDER**

Plaintiff Alexander Howell[1] brought this action under 42 U.S.C. § 1983, alleging the violation of her constitutional rights during her incarceration at the Eastern Reception, Diagnostic and Correctional Center ("ERDCC").

This matter is before the Court on the Motion for Summary Judgment of Defendants Jimmy Kennon and Dennis Coleman, the only remaining defendants in this action. (Doc. 126). Defendants' Motion is fully briefed and ripe for disposition.

**I.    Background**

In her *pro se* Third Amended Complaint ("Complaint"), Howell alleges she was raped at ERDCC in December 2021 by her cellmate, Terrance Hall. (Doc. 46.) She alleges that she pushed the emergency button in her cell after the rape, but the button was ignored by the Defendant correctional officers Jimmy Kennon and Dennis Coleman.

 Upon review under 28 U.S.C. § 1915(3)(2), the Court[2] found Plaintiff stated cognizable claims for failure to protect and deliberate indifference to serious medical needs in violation of

---

[1] Plaintiff Alexander Howell is a transgender female inmate and uses the pronouns she/her.
[2] United States District Judge Ronnie L. White.

the Eighth Amendment against Defendants Kennon and Coleman in their individual capacities. (Doc. 44.)  The Court subsequently appointed counsel for Plaintiff.  (Doc. 66.)

Defendants filed a Motion for Summary Judgment in which they claim they are entitled to qualified immunity on Plaintiff's failure to protect claim.  (Doc. 126.)  Plaintiff, through counsel, opposes the Motion.  (Doc. 128.)

**II.     Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita 333Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence,* 358 F.3d 982, 985 (8th Cir. 2004).  "Instead, the dispute must be outcome determinative under prevailing law." *Mosley v. City of Northwoods,* 415 F.3d 908, 910-11 (8th Cir. 2005) (internal quotations omitted).  A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

2

### III. Facts[3]

Defendants offer the following facts in support of their Motion:

At all relevant times herein, Plaintiff was an inmate incarcerated within the Missouri Department of Corrections.  On December 16, 2021, Plaintiff was incarcerated at ERDCC, located in Bonne Terre, Missouri.  Plaintiff alleges that she was sexually assaulted by her cellmate at ERDCC on that date.  At no time prior to the alleged sexual assault did Plaintiff inform Defendants that she was fearful of her cellmate.  (Doc. 127 at 1-2.)

Plaintiff does not dispute any of Defendants' facts but offers a Statement of Additional Uncontroverted Material Facts supported with citations to the record.  (Doc. 129.)  Defendants did not respond to Plaintiff's Statement of Additional Uncontroverted Material Facts.  Consequently, those facts are deemed admitted.  *See Holschen v. Intl. Union of Painters & Allied Trades/Painters Dist. Council No. 2*, No. 4:07-CV-01455-JCH, 2008 WL 4722713, at *1 (E.D. Mo. Oct. 23, 2008) (deeming non-moving party's unobjected-to additional facts as admitted).

Plaintiff's admitted material facts are as follows:

Plaintiff was transferred to ERDCC on December 15, 2021.  As part of the intake process at ERDCC, Plaintiff underwent an Adult Internal Risk Assessment ("Assessment").  The Assessment assesses offenders for the risk of being sexually abused by other offenders.  During the Assessment, Plaintiff reported that she was transgender and that she had been previously raped by an inmate while incarcerated in St. Louis, Missouri.  Following the Assessment,

---

[3]Defendants' "Statement of Facts" is deficient because it is not filed in a separate filing event. *See* E.D. Mo. L.R. 4.01(E) ("[e]very memorandum in support of a motion for summary judgment must be accompanied by a document titled Statement of Uncontroverted Material Facts, which must be separately filed using the filing event, "Statement of Uncontroverted Material Facts"). In the interest of expediency, the Court will address Defendants' Motion despite this deficiency.

3

Plaintiff was classified as a Sigma. The Sigma classification meant that the individual is more likely to be abused or easily taken advantage of.

Following the intake process, Plaintiff was assigned to a cell in Housing Unit 9, B-Wing. On December 16, 2021, Plaintiff was reassigned to Housing Unit 7, D-Wing, cell 102. Cell D-102 had a solid steel door with a six-inch-wide window. There are four officers assigned to each housing unit: one Sergeant, one Bubble Officer, and two Corrections Officers.

Defendant Kennon held the position of Corrections Officer 2 ("CO 2") and was the Sergeant in Housing Unit 7 on December 16, 2021. As a CO 2, Kennon was involved with the housing assignment process for inmates and had the authority to assign inmates to cells. If Kennon learned or suspected that an inmate was at risk, he was required to take immediate action by securing the inmate and contacting a lieutenant.

Defendant Coleman held the position of Corrections Officer 1 ("CO 1"), and was the "Bubble Officer" in Housing Unit 7 on December 16, 2021. It is the responsibility of the Bubble Officer to monitor an inmate's use of the emergency duress button. When an inmate presses the emergency duress button in their cell, ERDCC policy required corrections officers to immediately respond. When the emergency duress button is hit, it sounds an alarm in the control room notifying the Bubble Officer that it has been pressed. A panel right in front of the Bubble Officer also lights up, notifying the Bubble Officer which cell's emergency duress button has been hit. When an inmate presses the emergency duress button, Coleman would normally call the back office and tell the Sergeant or a CO 1, "hey, you have duress in this cell." (Doc. 129-3 at p. 21.) Kennon was one of the officers that would respond to an inmate's use of the emergency duress button. The video surveillance cameras in Housing Unit 7 did not allow the Bubble Officer monitoring the cameras to see into the cells.

4

Housing Unit 7 typically had 144 inmates housed throughout its four separate wings. Security checks were conducted once an hour in D-Wing of Housing Unit 7. During a security check, corrections officers go into each wing and check each cell to make sure the offenders are where they are supposed to be and that nothing is going on that is wrong. An institutional count took place two times a day, during which every offender in the prison is accounted for. After the morning institutional count, which occurred at 11:15 a.m., Kennon mainly did paperwork in the back office.

Prior to Plaintiff entering Housing Unit 7, the intake staff verbally notified Kennon that Plaintiff was transgender. Transgender inmates are at a high risk for sexual victimization and abuse. At approximately 3:25 p.m. on December 16, 2021, Plaintiff entered Housing Unit 7 and was directed to cell D-102 by Kennon. When Plaintiff was placed in cell 102, there was no consideration made regarding the other offender with which she was celled. Plaintiff's cellmate in cell 102 was Terrance Hall. Hall was classified as a Kappa. Kappas can be aggressive. Prior to Plaintiff being placed in cell 102, Coleman did not consider whether it was safe for Plaintiff to be housed in a cell with Hall.

After Plaintiff entered cell D-102, Kennon asked Terrance Hall, "what did you do to deserve this?" (Doc. 129-1 at p. 2.) Plaintiff told Kennon that she was "not a prized possession." *Id.* After Kennon walked away, Plaintiff began unpacking her personal belongings. Hall noticed that Plaintiff had a bra and panties and told Plaintiff to get out of his cell. Hall also stated, loud enough for others in D-Wing to hear, "we have one of those things in here" and "it has breasts." *Id.* After Plaintiff finished unpacking, she watched television through the window on the door of her cell. Moments later, Hall pinned Plaintiff up against the door, pulled her pants

5

down, and raped her.  Plaintiff pressed the emergency duress button in her cell and cried out for help, but no one responded.

After the sexual assault, Hall told Plaintiff, "They knew what they were doing.  They thought I was lying.  I'm sorry it had to happen this way." *Id.*  Plaintiff asked Hall what he meant, to which Hall responded, "they was trying to be funny.  They think this was a joke.  They only did this because they know what type of person I am." *Id.*  Plaintiff pressed the emergency duress button located in her cell a second time, but no one responded.  Kennon and Coleman ignored the emergency duress button entirely.  Approximately thirty minutes to an hour later, Kennon was conducting an institutional count and asked Plaintiff why she had pressed the emergency duress button.  Kennon also asked Plaintiff if she wanted protective custody.  Plaintiff told Kennon that she did not want protective custody but needed to speak with him about an urgent personal concern.  Kennon shrugged his shoulders and walked away.

**V.     Defendants' Motion**

Defendants argue that they are entitled to summary judgment on Plaintiff's failure to protect claim based on qualified immunity, because Plaintiff never informed Defendants that she was fearful for her safety.

Plaintiff responds that she has set forth evidence supporting a reasonable inference that Defendants knew that she faced a substantial risk of harm and deliberately disregarded that risk.  Plaintiff further argues that her constitutional right was clearly established at the time of Defendants' misconduct.  As such, she contends that Defendants' Motion should be denied.

"Qualified immunity shields government officials performing discretionary functions from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vandevender v. Sass*,

6

970 F.3d 972, 975 (8th Cir. 2020) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This immunity allows "officers to make reasonable errors ... and provides ample room for mistaken judgments." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011) (citing *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)); *Malley v. Briggs*, 475 U.S. 335, 343 (1986) (quotations omitted).  It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.  Critically, qualified immunity is "an immunity from suit rather than a mere defense to liability." *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004).

"The critical inquiry for qualified immunity purposes" in failure-to-protect cases is "whether it was 'objectively legally reasonable' for the prison official to believe his conduct did not violate the inmate's clearly established Eighth Amendment right." *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000).  In *Farmer v. Brennan*, the Supreme Court noted that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. 825, 844 (1994).  Adding "[w]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id*. at 845.

To determine whether qualified immunity applies here, this Court must determine "(1) whether the facts that [Howell] has alleged or shown make out a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of [Kennon and Coleman's] alleged misconduct." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010).

### Plaintiff's Eighth Amendment Claim

Inmates have a clearly established constitutional right to be protected from violence by other inmates. *Curry*, 226 F.3d at 977.  Indeed, "[p]rison officials have a duty to protect

7

prisoners from violence at the hands of other prisoners." *Holden v. Hirner*, 663 F.3d 336, 340-41 (8th Cir. 2011).  The question here is whether Plaintiff has adequately demonstrated that Kennon and Coleman violated that constitutional right.  On that issue, a prison official "violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." *Vandevender*, 970 F.3d at 975 (citation omitted).

Thus, Plaintiff's "failure-to-protect claim has an *objective* component, whether there was a substantial risk of harm to the inmate, and a *subjective* component, whether the prison official was deliberately indifferent to that risk." *Curry*, 226 F.3d at 977 (Emphasis added). Nevertheless, as "prisons are inherently dangerous environments, [i]t is not ... every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Vandevender*, 970 F.3d at 976 (quotation marks omitted) (internal citations omitted).  "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 845-46 (internal citations omitted).

A.   **Substantial Risk of Serious Harm**

As to the "substantial risk of serious harm" objective requirement of a failure to protect claim, the Eighth Circuit has previously held that a plaintiff has successfully established a substantial risk of serious harm to a victim in the following situations: (1) where "the attacker was known to be a volatile, dangerous man," (2) where the attacker "previously threatened or fought with the victim," or (3) where the attack involved "a victim who should have been better protected because of known prior inmate threats." *Vandevender*, 970 F.3d at 976 (citing *Young v.*

8

*Selk*, 508 F.3d 868, 873 (8th Cir. 2007); *Newman v. Holmes,* 122 F.3d 650, 651 (8th Cir. 1997); *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998); *Prater v. Dahm*, 89 F.3d 538, 540 (8th Cir. 1996); *Jones v. Wallace*, 641 F. App'x 665, 666 (8th Cir. 2016); *Pagels v. Morrison*, 335 F.3d 736, 739 (8th Cir. 2003)).  In the alternative, a plaintiff can demonstrate a substantial risk due to a general risk of harm by "showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *Patterson v. Kelley*, 902 F.3d 845, 852 (8th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842).

      Here, it is undisputed that Plaintiff reported during her intake Assessment at ERDCC that she was transgender and that she had been sexually assaulted by an inmate while incarcerated at a different institution.  As a result, Plaintiff was classified as a Sigma.  Defendants testified that a Sigma classification means an individual is more likely to be abused or easily taken advantage of by other inmates.  (Doc. 129-2 at 10; Doc. 129-3 at 15.)  They further testified that, as a transgender inmate, Plaintiff was at a high risk for sexual victimization and abuse.  (Doc. 129-2 at 9; Doc. 129-3 at 15.)  Plaintiff's cellmate Terrence Hall was a Kappa, a classification that signified the individual could be aggressive.  Plaintiff stated in her sworn Declaration that, as she entered the cell, Kennon asked Hall what he "did to deserve this?"  (Doc. 129-1 at 2.)  Hall saw Plaintiff's bra and panties and told Plaintiff to get out of his cell, yelling loudly enough for others in D-Wing to hear, "we have one of those things in here" and "it has breasts." *Id.*  Housing Unit 7 typically had 144 inmates housed throughout its four separate wings, with only four officers assigned to the wings, including the Bubble Officer.  Moreover, visibility into the cells was extremely limited.  The cell doors were made of solid steel and had only a six-inch-wide window.  (Doc. 129-3 at 20.)  After the rape, Hall told Plaintiff that "they knew what they were

9

doing," they were "trying to be funny," and they "only did this because they know what type of person I am." (Doc. 129-1 at 2.)

Defendants have made no attempt to controvert Plaintiff's sworn testimony or otherwise dispute her supported facts. Indeed, Defendants' arguments are focused on the subjective component of the failure to protect analysis. The undersigned finds that Plaintiff has set forth sufficient evidence to show she faced a substantial risk of harm of being assaulted by being placed in a cell with Hall. *See Whitson v. Stone County Jail*, 602 F.3d 920, 924 (8th Cir. 2010) (when female prisoner was sexually assaulted by male prisoner after being placed in the back of a dark transport van with the male prisoner with no supervision, Court stated "it is virtually certain that the objective requirement is met").

**B.    Deliberate Indifference**

As to the "deliberate indifference" subjective requirement of a failure to protect claim, the Eighth Circuit has held that a plaintiff successfully establishes that a defendant is deliberately indifferent to a substantial risk of harm to him by showing that the defendant has *knowledge* of the risk and disregards that risk. *Farmer*, 511 U.S. at 837 (emphasis added). "Deliberate disregard is a mental state 'equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposely causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (quoting *Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011)). "To be liable, an 'official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Vandevender*, 970 F.3d at 975-76 (Commenting that failure-to-protect cases most often arise from inmate-on-inmate

10

assaults involving an attacker who was known to be a "volatile, dangerous" person; or a victim who should have been better protected because of known prior inmate threats.).

Defendants rely on the fact that Plaintiff "concedes that she never informed Defendants that she was at risk of serious injury."[4] (Doc. 134 at 1.) Defendants, however, misstate the law.

In *Whitson*, discussed above, the defendant officers made the same argument as the Defendants in this matter. They argued that because the plaintiff victim had no prior interaction with her attacker, she "had no idea that [her attacker] might try to sexually assault her, and did not protest the decision to place her in the back of the van" with her attacker, the "officers had no more reason to suspect any harm to [the victim] than [the victim] did herself." *Whitson*, 602 F.3d at 924. The Eighth Circuit rejected this argument, noting it "misstates the law," and that the failure of the victim to notify the defendant officers of a risk of harm "has little to do with a correct conclusion." *Id.* at 925. Instead, the Court stated that the "pivotal issue in this regard deals with whether the defendants had a sufficiently culpable state of mind." *Id. See also Farmer*, 511 U.S. at 843-44; *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002) ("The Supreme Court [has] made clear…that, in order to have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant or defendants specifically knew about or anticipated the precise source of the harm....") (emphasis in original).

In this case, Plaintiff has set forth sufficient evidence to show that Defendants had knowledge of the risk of assault and were deliberately indifferent to that risk. As to Defendants' knowledge, Kennon and Coleman testified that transgender inmates were at a high risk for sexual victimization and abuse. (Doc. 129-2 at 9; Doc. 129-3 at 15.) Intake staff verbally notified

---

[4] In *Farmer*, the Supreme Court commented that the Eighth Amendment does not require "advance notification of a substantial risk of assault posed by a particular fellow prisoner." 511 U.S. at 849, fn 10.

Defendant Kennon that Plaintiff was transgender prior to the time she entered Housing Unit 7. (Doc. 129-2 at 13.)  As a CO 2, Kennon had the authority to assign inmates to cells, and was required to take immediate action if he learned or suspected that an inmate was being harassed or abused.  (Doc. 129-2 at 11, 12.)  Defendant Coleman testified that he printed off the housing unit assessment roster and, if he noticed anything that he "thought was going to be an issue," he would report it.  (Doc. 129-3 at 23.)  Kennon and Coleman both testified that they did not consider whether it was safe for Plaintiff to be housed with Hall—a Kappa—prior to Plaintiff being placed in the cell.  (Doc. 129-2 at 15; Doc. 130-3 at 23.)  Coleman directed Plaintiff from the bubble to the D-Wing, after which Kennon directed Plaintiff from the entrance of the D-Wing to her cell.  (Doc. 129-3 at 22; Doc. 129-2 at 18.)  As discussed above, upon Plaintiff entering the cell, Kennon asked Hall what he did "to deserve this."  (Doc. 129-1 at 2.)  After the assault, Hall stated to Plaintiff that "they knew what they were doing," and that "they" were "trying to be funny" and knew "what type of person" Hall was.  *Id.*

The events that occurred after Plaintiff was raped support an inference that Defendants deliberately disregarded the known risk of harm Plaintiff faced by being celled with Hall. Defendants testified that Coleman, as the Bubble Officer on duty at the time, was responsible for monitoring the use of emergency duress buttons and notifying the corrections officers when they were activated, and that corrections officers were required to respond immediately.  (Doc. 129-2 at 12-13, 18-19; Doc. 129-3 at 5, 6-7, 19, 21.)  Nonetheless, it is undisputed that both Defendants ignored Plaintiff's calls for help.  An hour after the rape, when Kennon was conducting a routine institutional count, he asked Plaintiff why she pressed the emergency duress button.  (Doc. 129-1 at 3.)  These facts support the inference that Coleman knew that Plaintiff had pressed the duress

12

button, Coleman informed Kennon Plaintiff had activated the duress button, and both Defendants failed to immediately respond to the duress button, in violation of ERDCC policy.

In sum, Plaintiff has produced sufficient evidence to support her claim that Defendants were aware of a substantial risk of serious harm to Plaintiff and deliberately disregarded that risk by allowing her to be placed in a cell with Hall.  Thus, Defendants are not entitled to qualified immunity on Plaintiff's failure to protect claim, and Defendants' Motion for Summary Judgment will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 126) is **denied**.

**IT IS FURTHER ORDERED** that a phone conference with counsel of record is scheduled for **Friday, October 17, 2025, at 11:00 a.m.**

Dated: October 15, 2025.

                                                     s/*Abbie Crites-Leoni*
                                                     ABBIE CRITES-LEONI
                                                     UNITED STATES MAGISTRATE JUDGE